# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
# Judge Robert E. Blackburn

Civil Case No. 09-cv-02386-REB-MEH

CAROLINE RHEIN as Personal Representative for the Estate of Peter Shawn Ramirez,

    Plaintiff,

v.

COMMERCE CITY POLICE DETECTIVE DAN McCOY,
COMMERCE CITY POLICE DETECTIVE DEREK ARAGON, individually,
COMMERCE CITY POLICE DEPARTMENT, individually and severally, and
COMMERCE CITY, COLORADO, individually and severally,

    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**Blackburn, J.**

    This matter comes before me on the defendants' **Combined Motion and Memorandum in Support of Summary Judgment Asserting Defense of Qualified Immunity** [#13][1] filed November 17, 2009. The plaintiff filed a response [#19], and the defendant filed a reply [#22]. The plaintiff filed also a motion to supplement the record [#23], noting a case decided recently by the United States Court of Appeals for the Tenth Circuit. I grant the motion for summary judgment.

## I. JURISDICTION

My jurisdiction arises under 28 U.S.C. § 1331 (federal question).

## II. STANDARD OF REVIEW

Summary judgment is proper when there is no genuine issue as to any material

---

[1] "[#13]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Farthing v. City of Shawnee*, 39 F.3d 1131, 1135 (10th Cir. 1994). A fact is "material" if it might reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Farthing*, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of a genuine fact issue. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994), *cert. denied*, 514 U.S. 1004 (1995). Once the motion has been properly supported, the burden shifts to the nonmovant to show, by tendering depositions, affidavits, and other competent evidence, that summary judgment is not proper. *Concrete Works*, 36 F.3d at 1518. All the evidence must be viewed in the light most favorable to the party opposing the motion. *Simms v. Oklahoma ex rel Department of Mental Health and Substance Abuse Services*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 528 U.S. 815 (1999). However, conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence. *Rice v. United States*, 166 F.3d 1088, 1092 (10th Cir.), *cert. denied*, 528 U.S. 933 (1999); *Nutting v. RAM Southwest, Inc.*, 106 F.Supp.2d 1121, 1123 (D. Colo. 2000).

The individual defendants, Detectives Aragon and McCoy, assert the defense of qualified immunity, and they raise that defense as one of the bases for their motion for summary judgment. A motion for summary judgment asserting qualified immunity must

be reviewed differently from other summary judgment motions. ***See Saucier v. Katz***, 533 U.S. 194, 201 (2001), **overruled in part, *Pearson v. Callahan***, ___ U.S. ___, 129 S. Ct. 808 (2009); ***Holland v. Harrington***, 268 F.3d 1179, 1185 (10th Cir. 2001), **cert. denied**, 535 U.S. 1056 (2002). After a defendant asserts qualified immunity, the burden shifts to the plaintiff. ***Scull v. New Mexico***, 236 F.3d 588, 595 (10th Cir. 2000). To overcome a claim of qualified immunity, the plaintiff first must establish "that the defendant's actions violated a constitutional or statutory right." ***Albright v. Rodriguez***, 51 F.3d 1531, 1534 (10th Cir. 1995); ***Wilson v. Layne***, 526 U.S. 603, 609 (1999) (noting the court must first decide whether the plaintiff has alleged deprivation of a constitutional right). This burden means coming forward with specific facts establishing the violation. ***Taylor v. Meacham***, 82 F.3d 1556, 1559 (10th Cir.1996).

If the plaintiff establishes a violation of a constitutional or statutory right, then he must demonstrate that the right at issue was clearly established *at the time* of the defendant's alleged unlawful conduct. ***Albright***, 51 F.3d at 1534. To demonstrate clearly established law, "there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts," which find the law to be as the plaintiff maintains. ***Medina v. City and County of Denver***, 960 F.2d 1493, 1498 (10th Cir.1992), **overruled in part, *Williams v. City & County of Denver***, 99 F.3d 1009, 1014 - 1015 (10th Cir. 1996). The plaintiff must demonstrate a substantial correspondence between the conduct in question and prior law establishing that the defendant's actions clearly were prohibited. ***Hilliard v. City and County of Denver***, 930 F.2d 1516, 1518 (10th Cir. 1991) (citing ***Hannula v. City of Lakewood***, 907 F.2d 129, 131 (10th Cir. 1990)). In determining whether the right was "clearly established,"

3

the court assesses the objective legal reasonableness of the action at the time and asks whether "the right [was] sufficiently clear that a reasonable officer would understand that what he is doing violates that right." **Wilson v. Layne**, 526 U.S. at 615. However, the plaintiff need not establish a "'precise factual correlation between the then-existing law and the case at hand . . . .'" **Patrick v. Miller**, 953 F.2d 1240, 1249 (10th Cir.1992), (quoting **Snell v. Tunnell**, 920 F.2d 673, 699 (10th Cir. 1990)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." **Anderson v. Creighton**, 483 U.S. 635, 639 (1987) (quotations and citations omitted).

If the plaintiff satisfies both of these elements, then the burden shifts to the defendant. Unless the defendant demonstrates that there is no disputed issue of material fact relevant to the immunity analysis, a motion for summary judgment based on qualified immunity must be denied. **Salmon v. Schwarz**, 948 F.2d 1131, 1136 (10th Cir.1991). If the plaintiff fails to satisfy either part of the two-pronged inquiry, then the court must grant qualified immunity. **Albright**, 51 F.3d at 1535. In short, although the court must review the evidence in the light most favorable to the plaintiff, a defendant's assertion of qualified immunity may be overcome only when the record demonstrates clearly that the plaintiff has satisfied his heavy two-part burden. In civil rights cases, a defendant's unlawful conduct must be demonstrated with specificity. **Davis v. Gracey**, 111 F.3d 1472, 1478 (10th Cir. 1997).

In a recent opinion, the United States Supreme Court altered somewhat the

4

analytical process that may be used when a defendant claims the protection of qualified immunity. **Pearson v. Callahan**, ___ U.S. ___, 129 S. Ct. 808 (2009). Under **Saucier v. Katz**, a court addressing a claim of qualified immunity was required first to determine whether the plaintiff has adduced facts sufficient to make out a constitutional or statutory violation. **Saucier**, 533 U.S. at 201. Under **Saucier**, a court must address and resolve this first question before proceeding to the second step of the analysis, a determination of whether the claimed constitutional or statutory right was established clearly at the time of the alleged violation. **Id**. In **Pearson**, the Supreme Court held that the sequential two step analysis mandated in **Saucier**

> should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.

**Pearson**, ___ U.S. ___, ___, 129 S.Ct. 808, 818 (2009). The Supreme Court noted, however, that the sequence set forth in **Saucier** often is the appropriate analytical sequence. **Id**. In this case, I conclude that the two step, sequential analysis of **Saucier**, although no longer required, is the appropriate analytic format.

### III. UNDISPUTED MATERIAL FACTS

The facts described in this section are undisputed. On Thursday, March 12, 2009, Detectives Derek Aragon and Dan McCoy were on-duty and driving in Detective McCoy's unmarked police car. At approximately 4:00 p.m., both detectives heard dispatch air information that a white sedan occupied by two males had been involved in an armed car jacking. The location of the car jacking was in the vicinity of the detectives'

5

location at that time. As dispatch was airing this information, both detectives observed a white sedan drive past them. The white sedan was driving erratically and appeared to have front end damage.

Detectives Aragon and McCoy followed the white sedan. The white sedan drove northbound on Chambers Road, turned eastbound onto 120th Avenue, and then northbound on Jasper Street into a residential subdivision. In the subdivision, the white sedan came to a stop in a position facing the detectives' vehicle. Based on the dispatch information indicating that the suspects in the car jacking were armed, both Detectives Aragon and McCoy exited their vehicle with their guns drawn, and ordered the occupants of the white sedan to exit their car and show their hands. The occupants disregarded these commands, drove out of the subdivision, and returned to 120th Avenue via Jasper Street. Detectives Aragon and McCoy followed in their vehicle, now with lights and sirens activated. The white sedan drove westbound on 120th Avenue. At the intersection of 120th Avenue and Chambers Road, the white sedan stopped in front of another car, driven by Daniel Leckner, blocking Leckner's car from driving forward. The two males in the white sedan, later identified as Marcus Giron and Peter Shawn Ramirez, got out of their car. Giron approached the front passenger's side window of Leckner's car, pointed a gun at Leckner through the window, and began beating on the window telling Leckner to get out of the car. Ramirez approached the front driver's side window of Leckner's car, began beating on the window and ordering Leckner to get out of his car.

Detective McCoy parked behind the white sedan. As Detective Aragon got out of the car, he yelled "gun" and Detective McCoy heard two gun shots. As Detectives

6

Aragon and McCoy approached Giron and Ramirez, Giron and Ramirez started to run westbound on 120th Avenue. As Giron ran away, he threw away a gun. At this point, McCoy could see that Ramirez was carrying a gun as he ran westbound on 120th Avenue. Ramirez ran at a car stopped at the intersection of 120th Avenue and Chambers Road. This car was driven by Charles Fishler. As Ramirez approached Fishler's car, Ramirez aimed his gun at Fishler. Ramirez moved to the front driver's side window of Fishler's car, continued to point his gun at Fishler, and began banging on the window of the car with the butt of his gun, gesturing for Fishler to get out of the car. Fishler drove away. At about this time, Detective McCoy noted that Ramirez was holding "a black semi-automatic handgun that appeared to have an extended magazine." *Motion for summary judgment* [#13], Exhibit A (McCoy Affidavit), ¶ 23. Ramirez repeated this conduct as he apprached the next eastbound vehicle at the intersection, aiming his gun at the driver through the windshield and then through the driver's side window, while Giron was attempting to open the driver's side door.

Ramirez and Giron started to approach the next eastbound vehicle in the same way. As Ramirez approached this car, Aragon had a clear view of Ramirez with no citizen's vehicle in his line of sight. Ramirez still was holding his gun. Aragon fired shots at Ramirez, but stopped firing as Ramirez approached the next eastbound car. Again, Ramirez aimed his gun at the driver of this car and began banging his gun against the driver's side window. This car also drove away. Ramirez then ran to another eastbound car, stood in front of the car aiming his gun at the driver, and then moved to the driver's side window. This car also drove past Ramirez.

Ramirez and Giron started to approach another eastbound car. Once again,

7

Aragon got a clear view of Ramirez with no citizen vehicle in his line of sight. Aragon could see more cars traveling eastbound on 120th Avenue approaching the intersection where Ramirez and Giron had been confronting vehicles. Aragon could see that Ramirez still was carrying a gun. Aragon fired more shots at Ramirez. Ramirez continued to run westbound. McCoy had also pursued Ramirez up to this point and had seen Ramirez point his gun at several drivers in their cars. It was 4:00 p.m., on a weekday afternoon, and McCoy knew that traffic in the area generally was heavy at this time. As the last in a series of eastbound vehicles drove away from the intersection, McCoy had a clear view of Ramirez with no citizen's vehicle obstructing McCoy's view. McCoy fired one shot at Ramirez, Ramirez fell to the ground, and dropped the gun he had been carrying. Giron also was shot. Aragon signaled for a passerby to call 911 and used another officer's radio to call for medical assistance shortly after Ramirez and Giron had been disabled. Ramirez suffered three gunshot wounds, one of which was a graze gunshot wound to the left arm. *Response* [#19], Exhibit A. A short time later, Ramirez died as a result of his wounds.

Throughout the incident, Aragon and McCoy repeatedly identified themselves as police and repeatedly commanded Ramirez to drop his gun. Ramirez did not comply with these repeated commands from Aragon and McCoy. As this incident developed, McCoy reasonably feared that Ramirez would shoot McCoy, Aragon, or the occupant of any vehicle that approached the intersection, posing a grave risk to public safety. *Motion for summary judgment* [#13], Exhibit B (McCoy affidavit), ¶ 22. As Aragon observed Ramirez's repeated car jacking attempts, Aragon believed that the occupants of any car Ramirez encountered were in immediate danger of being shot, posing an

immediate risk to public safety. *Id.*, Exhibit A (Aragon Affidavit), ¶ 32.

Based on the fact that Ramirez was shot by Detective McCoy, and possibly by Detective Ramirez, the plaintiff, Caroline Rhein, acting as the personal representative of Ramirez's estate, filed this lawsuit against Detectives Aragon and McCoy and against Commerce City. Rhein alleges, *inter alia*, that "(d)uring this entire sequence of events, (Ramirez) posed no danger to the Detectives or the public." *Complaint* [#1], ¶ 12. Rhein alleges that Ramirez "was deprived of his life and of his constitutionally protected right to be protected from cruel and unusual punishment as provided by the Eighth Amendment of the constitution of the United States. . . ." *Id.*, ¶ 13. Rhein asserts a claim captioned as "Excessive Force during Pursuit," in which she alleges that "Detectives McCoy and Aragon used excessive and deadly force when pursuing (Ramirez). (Ramirez) posed no threat substantial enough to justify the multiple gunshot wounds inflicted by the Commerce City Detectives." *Id.*, ¶ 20. Rhein asserts also a claim against Commerce City, alleging that the policies, customs, or usages of Commerce City deprived Ramirez of the "right not to have cruel and unusual punishment inflicted, as guaranteed by the Eighth Amendment." *Id.*, ¶ 17.

### IV.  ANALYSIS

#### A.  Excessive Force Claim

The only provision of the United States Constitution cited in the plaintiff's complaint [#1] is the Eighth Amendment. The Eight Amendment is not applicable to a claim that police officers used excessive force in effectuating an arrest.

> (T)he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to

9

>impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

*Ingraham v. Wright*, 430 U.S. 651, 671 n. 40 (1977). Nothing in the Complaint or in the record of this case supports the contention that the actions of Detectives Aragon and McCoy involved an effort to punish a pretrial detainee. Rather, the plaintiff's claim is that Detectives Aragon and McCoy used unreasonable and excessive force in effectuating Ramirez's arrest because Ramirez "posed no danger to the Detectives or the public," and Ramirez "posed no threat substantial enough to justify the multiple gunshot wound inflicted by the Commerce City Detectives." *Complaint*, ¶¶ 12, 20.

As the defendants note in their motion for summary judgment, "all claims that law enforcement officers have used excessive force - deadly or not - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "A 'seizure' triggering the Fourth Amendment's protections occurs only when government actors have, 'by means of physical force or show of authority, ... in some way restrained the liberty of a citizen.'" *Graham*, 490 U.S. at 395 n. 10 (*quoting Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968). I agree and analyze Rhein's claims under the Fourth Amendment reasonableness standard.

To prevail on her Fourth Amendment claim, Rhein must show that (1) a seizure occurred; and (2) that the force used in making the seizure was unreasonable. *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). There is no dispute that Detectives Aragon and McCoy's use of force effected a seizure of Ramirez. The key issue is whether their use of force was objectively reasonable given the circumstances.

The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id*. (*citing Graham v. Connor*, 490 U.S. 386, 396 (1989)). Because police officers often are forced to make split-second judgments about the amount of force that is necessary in circumstances that are tense, uncertain, and rapidly evolving, the reasonableness of the officer's belief as to the appropriate level of force should be judged from an on-scene perspective. *Id*. at 1259-60 (*quoting Saucier*, 533 U.S. at 205 and *Graham*, 490 U.S. at 397). Ultimately, the objective reasonableness of an officer's use of force should be assessed on whether the totality of the circumstances justified the use of force, paying careful attention to the facts and circumstances of a particular case. *Id*. (*citing Sevier v. Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995)).

The Supreme Court has established three elements for the reasonable use of deadly force against a fleeing suspect: I1) whether the suspect threatened the officer with a weapon or there was probable cause to believe that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm; (2) whether the deadly force was necessary to prevent escape; and (3) whether, if feasible, a warning had been given to the suspect. *Tennessee v. Garner*, 471 U.S. 1, 12 (1985). Reviewing this elements, the Tenth Circuit concluded: "(T)here are two basic situations that would justify an officer's belief that a fleeing suspect poses a threat of serious physical harm: (1) where the suspect has placed the officer in a dangerous, life threatening situation; or (2) where the suspect is fleeing from the commission of an inherently violent crime." *Ryder v. City of Topeka*, 814 F.2d 1412, 1419 (10th Cir. 1987). The latter situation does not require that the officer's life actually be threatened

by the suspect, rather the officer is allowed to infer that the suspect is inherently dangerous by the violent nature of the crime. *Id*. The Supreme Court has noted that, when analyzing an officer's conduct in an excessive force case, it must weigh risks that the officer's conduct posed on the suspect against the threat posed by the suspect to the public and the officer. ***Scott v. Harris***, 550 U.S. 372, 383 - 384 (2007). The Court explained that in "weighing perhaps the lesser probability of injuring or killing numerous bystanders against the perhaps larger probability of injuring or killing a single person," it is appropriate to "take into account not only the number of lives at risk, but also their relative culpability." *Id*. at 384. Thus, the Court considered that the plaintiff in Harris "intentionally placed himself and the public in danger by unlawfully engaging in the reckless, high-speed flight that ultimately produced the choice between two evils that [the officer] confronted." *Id*. The Court noted that those who could have been harmed by the fleeing suspect were innocent, and the suspect had engaged in intentionally criminal conduct. *Id*. The Court had "little difficulty" concluding that the officer was entitled to use deadly force in that scenario. *Id*.

Viewing the undisputed facts in the record in the light most favorable to Rhein, I conclude that there is no basis to argue that the actions taken by Detectives Aragon and McCoy were anything but reasonable. Ramirez repeatedly disregarded the detectives' orders that Ramirez drop his gun. Rather, Ramirez attempted to evade the detectives and repeatedly pointed his gun at innocent people who were driving by the scene. Ramirez took these actions on a busy street at a time of day when traffic generally was heavy. Given these circumstances, there is no question that Detectives Aragon and McCoy reasonably believed that Ramirez posed a grave risk to public safety and a

grave risk to the safety of the detectives. The danger posed by Ramirez was at least as high, and probably higher, than the danger posed by the fleeing suspect in *Scott v. Harris*. Ramirez threatened directly the lives of several innocent persons who passed by, and he presented a continuing threat to Detectives McCoy and Aragon and to others who were likely to encounter Ramirez. Considering all of the circumstances faced by Detectives Aragon and McCoy, there is no doubt that their use of deadly force to disable Ramirez was reasonable.

In her response [#19] to the defendants' motion for summary judgment, Rhein does not dispute the facts established by the defendants in their motion for summary judgment. Rather, Rhein cites two pieces of evidence: (1) the report of the autopsy conducted on Ramirez; and (2) a portion of Detective McCoy's affidavit. *Response* [#19], Exhibits A & B. The autopsy report indicates that two of the gunshot wounds suffered by Ramirez were to his left buttocks with a trajectory of back to front. *Response* [#19], Exhibit A, CM/ECF pages 19 - 20. Rhein notes in her response [#19] that neither of the detective's affidavits note that "they shot Ramirez in the back with multiple gunshots."

Rhein argues that "the use of deadly force was not required given the totality of the circumstances and the fact that there was no sufficient time period which would have warranted deadly force being utilize (sic) where any perimeter could have been established by Officer Aragon and Officer McCoy to affect (sic) the arrest of Ramirez." *Response* [#19], pp. 10 - 11. Rhein cites no evidence to support her contention that Detectives Aragon and McCoy could have established a perimeter around Ramirez that would have effected his arrest without the need to shoot Ramirez. Rhein makes no

13

effort to address the immediate and continuing deadly threat to public and officer safety presented by Ramirez. Rhein cites no evidence to support her apparent contention that Detectives Aragon and McCoy had available to them some effective means, short of deadly force, to restrain Ramirez and remove the threats he presented. Considering the undisputed facts, the fact that the bullet or bullets that killed Ramirez entered his body from the rear is of no consequence. Ramirez presented a grave risk to public safety and a grave risk to the safety of the detectives. Thus, absent reasonable alternatives, the use of deadly force to restrain Ramirez was reasonable under the law. Rhein's argument on this point is factually and legally baseless.

Rhein claims also that the detectives' affidavits make "(n)o mention that either officer made any attempt to obtain medial assistance for Ramirez." *Response* [#19], p. 6. Rhein ignores the undisputed portion of Detective Aragon's affidavit in which he describes signaling for a passerby to call 911 and using another officer's radio to call for medical assistance shortly after Ramirez and Giron had been disabled. *Motion for summary judgment*, [#13], Exhibit A (McCoy Affidavit), p. 7. Rhein cites no evidence in support of her baseless factual contention. Further, Rhein makes no effort to demonstrate how the detectives' actions in calling for medical assistance is relevant to the question of whether or not the detectives' use of force against Ramirez was reasonable. Rhein's argument on this point is factually and legally baseless. The case cited by Rhein in her motion to supplement [#23] provides no support for her Fourth Amendment claim. The balance of Rhein's arguments and contentions in her response are equally baseless.

In sum, viewing the evidence in the record in the light most favorable to Rhein,

there is no question that Detectives Aragon and McCoy acted reasonably when they used deadly force to restrain Ramirez. No reasonable fact finder could find in favor of Rhein on the second key element of her Fourth Amendment claim, that the force used by the defendants was unreasonable. Leaving qualified immunity aside for the moment, Detectives Aragon and McCoy are entitled to summary judgment on Rhein's Fourth Amendment claim. Facing Detectives Aragon and McCoy's assertion of qualified immunity, Rhein has failed to adduce any facts that demonstrate a Fourth Amendment violation. Because Rhein has failed to establish any basis for her Fourth Amendment claim, Detectives Aragon and McCoy are entitled to qualified immunity and, on this basis, are also entitled to summary judgment on Rhein's Fourth Amendment claim.

### B. Claim Against Commerce City

Rhein's claim against Commerce City is also baseless.

> A § 1983 suit against a municipality for the actions of its police officers requires proof that (1) an officer committed a constitutional violation and (2) a municipal policy or custom was the moving force behind the constitutional deprivation that occurred. ***Jiron [v. City of Lakewood***, 392 F.3d [410] at 419 [(10th Cir. 2004)]. But without the predicate constitutional harm inflicted by an officer, no municipal liability exists. ***Id***. **(citing *City of Los Angeles v. Heller***, 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986)).

***Estate of Larsen ex rel. Sturdivan v. Murr***, 511 F.3d 1255, 1264 (10th Cir. 2008). Viewing the undisputed facts in the record in the light most favorable to Rhein, no reasonable fact finder could conclude that a Commerce City police officer committed a constitutional violation against Ramirez. Like her claims against Detectives McCoy and Ramirez, Rhein's claims against Commerce City are factually and legally baseless. Commerce City is entitled to summary judgment on Rhein's claim against it.

### C. Conclusion

The defendants are entitled to summary judgment on all of the claims asserted by Rhein in her complaint [#1].

## V.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That the defendants' **Combined Motion and Memorandum in Support of Summary Judgment Asserting Defense of Qualified Immunity** [#13] filed November 17, 2009, is **GRANTED**;

2.  That **JUDGMENT SHALL ENTER** in favor of the defendants, Commerce City Police Detective Dan McCoy, Commerce City Police Detective Derek Aragon, Commerce City Police Department, and Commerce City, Colorado, against the plaintiff, Caroline Rhein as Personal Representative for the Estate of Peter Shawn Ramirez;

3.  That the defendants are **AWARDED** their costs to be taxed by the Clerk of the Court pursuant to FED. R. CIV. P. 54(d)(1) and D.C.COLO.LCivR 54.1; and

4.  That jurisdiction is **RETAINED** to consider the imposition of sanctions under 28 U.S.C. § 1927.

Dated September 27, 2010, at Denver, Colorado.

BY THE COURT:

Robert E. Blackburn
United States District Judge